IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

VIVIAN Y. ELLISON,         )
         )
      Plaintiff,      )
         )
v.         )      CIVIL ACTION NO. 1:04cv988
         )      [WO]
JO ANNE B. BARNHART,     )
Commissioner of Social Security    )
         )
      Defendant.     )

**MEMORANDUM OPINION AND ORDER**

Claimant Vivian Y. Ellison ["Ellison"] filed this action seeking review of a final decision of the defendant ["Commissioner"] (Doc. # 1) pursuant to 42 U.S.C. §§ 405(g) (2005).  Upon review of the record and the briefs submitted by the parties, the court concludes that the Commissioner's decision should be affirmed.

## I.   FACTS AND PROCEDURAL HISTORY

Ellison claims that she became disabled on 1 January 2000 as the result of "tumors in both legs," "arthritis in both hands," and "depression" (R. 128, 142).[1]  She is 54 years old and a high school graduate with two years of college (R. 18, 104).  Prior to her alleged onset date, Ellison briefly compiled information for the United States Census Bureau and worked as a factory packer and inspector, but most of her relevant work experience was as a sewing

---

[1]Ellison's medical records indicate several possible conditions she did not list on her application for benefits, including hypertension, obesity, carpal tunnel syndrome, obstructive sleep apnea, osteoarthritis, mild congestive heart failure and mild cardiomegaly.

machine operator (R. 150).

Ellison first applied for benefits in August 1999, but her application was denied both initially and upon reconsideration in March 2000 (R. 34-37). Her request for a hearing was dismissed as untimely, and she did not appeal (R. 40-41). She again applied for benefits in January 2003 (R. 79), and, again, her application was denied (R. 42-43). A hearing before Administrative Law Judge James D. Smith ["ALJ"] resulted in an unfavorable decision, and the Social Security Administration's ["SSA"] Office of Hearings and Appeals denied her request for review (R. 7). Thus, the ALJ's opinion became the final decision of the Commissioner, and Ellison filed this timely lawsuit (Doc. # 1).

## II.    STANDARD OF REVIEW

The district court's review of the Commissioner's decision is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Miles v. Chater*, 84 F. 3d 1397, 1400 (11th Cir. 1996) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). The court must affirm the Commissioner's decision "if it is supported by substantial evidence and the correct legal standards were applied," *Kelley v. Apfel*, 185 F.3d 1211 (11th Cir. 1999) (citing *Graham v. Apfel*, 129 F. 3d 1420, 1422 (11th Cir. 1997)).[2] This is true despite the fact that

_____

[2]In *Graham v. Apfel*, 129 F. 3d at 1422, the Court of Appeals stated that:

> Substantial evidence is described as more than a
> scintilla, and means such relevant evidence as a
> reasonable mind might accept as adequate to

"[s]ubstantial evidence may even exist contrary to the findings of the ALJ." ***Barron v. Sullivan***, 924 F.2d 227, 230 (11th Cir. 1991).  "There is no presumption, however, that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid." ***Miles***, 84 F. 3d at 1400 (citations omitted).


## III.   DISCUSSION

### A.     *Standard for Determining Disability*

An individual who files an application for Social Security disability benefits must prove that he is disabled.  *See* 20 C.F.R. § 416.912 (2004).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (2004).

The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven that he is disabled.  *See* 20 C.F.R. § 416.920.  The ALJ must evaluate the claimant's case using this sequential evaluation process, ***Ambers v. Heckler***, 736 F.2d 1467, 1469 (11th Cir. 1984); ***Williams v. Barnhart***, 186 F. Supp. 2d 1192, 1195 (M.D. Ala. 2002).  The steps are as follows:

---

support a conclusion. ***See Richardson v. Perales***,
402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d
842 (1971).

1.    If the claimant is working or engaging in substantial gainful activity, he is not disabled.  If the claimant is not working or engaging in substantial gainful activity, however, the court must consider whether the claimant has a severe impairment.

2.    If the claimant does not have a severe impairment, he is not disabled.  A severe impairment is defined as a condition that precludes one from performing basic work-related activities. If the claimant has a severe impairment, the court must then consider whether the impairment has lasted or is expected to last for more than 12 months.

3.    If a claimant's impairment has lasted or is expected to last for a continuous period of 12 months or more and it is either included on or equivalent to an impairment listed in Appendix I of the regulations, the claimant is disabled. Otherwise, the ALJ must go on to step four of the evaluation sequence.

4.    If it is determined that the claimant can return to previous employment, considering his residual functional capacity ["RFC"] and the physical and mental demands of the work that he has done in the past, the claimant will not be considered disabled.  If it is determined that the claimant cannot return to previous employment, the ALJ must continue to step 5 in the sequential evaluation process.

5.    If, upon considering the claimant's RFC, age, education, and past work experience, the ALJ determines that the impairments determined do not

4

preclude the claimant from performing a significant number of jobs that are available in the national economy, the claimant will not be considered disabled within the meaning of the Social Security Act.  Therefore, she/he will not be entitled to benefits pursuant to 42 U.S.C. §§ 401 *et seq.* and/or 42 U.S.C. § 1381. If, however, it is determined that there are not a significant number of jobs the claimant can perform available in the national economy and the impairment meets the duration requirement, the claimant will be considered disabled.

*See* §§ 20 C.F.R.  404.1520(a)-(f), 416.920(a)-(f) (2005).

**B.      *Application of the Standard: the ALJ's Findings***

After discussing the legal standards and the evidence in the record, the ALJ made the following findings:

1.   The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through March 31, 2004.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant is obese and also has osteoarthritis, a depressive disorder, obstructive sleep apnea and hypertension, all of which are "severe" impairments based on the requirements in 20 C.F.R. §§ 404.1520(c) and 416.920(b).

4.   The   claimant's   impairments,   when   considered

5

individually and in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

5.     The claimant's assertions relative to symptomatology, functional limitations and restrictions of activities of daily living have been considered in light of the factors set forth in 20 C.F.R. §§ 404.1529 and 416.929 and SSR 96-7p, and are found to lack corroboration and substantiation in the medical evidence, and are not credible as to a disabling impairment.

6.     The claimant possesses the residual functional capacity to perform medium unskilled work activity not involving frequent public interaction.

7.     The claimant's past relevant work as a packager/inspector does not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

8.     It is the claimant's responsibility to provide medical evidence that supports her alleged disability.. . . The claimant has failed to meet this burden in this cause. (citation omitted).

9.     The hypothetical posed to the vocational expert by the claimant's representative was neither credible nor objective in nature, and is unsupported by clinical findings.  As such, the vocational expert's response to this hypothetical question is not credible.

10.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 30-31).  Thus, Ellison failed at the fourth step because the ALJ determined that she could

perform past relevant work.

6

Ellison disagrees and argues, generally, that the ALJ's opinion is not supported by substantial evidence in the record (Doc. # 13-1, pp. 10-11).  Specifically, Ellison contends that the ALJ erred by:

1.     finding that Ellison's alleged carpal tunnel syndrome and heart problems are not severe impairments;[3]

2.     discounting the opinion of an examining physician;

3.     finding that Ellison could return to previous relevant work;

4.     evaluating Ellison's subjective complaints;

5.      failing to develop the record; and

6.     failing to consider the "mental demands" of her past relevant work.

 (Doc. # 13-1).  For the reasons set forth *infra*, Ellison's arguments lack merit.


C.    *Non-severe Impairments*

"An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a) (2005).  In other words, "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective

---

[3]The ALJ also determined that Ellison's alleged problems with her legs were unrelated to distant prior surgery.  Moreover, the ALJ found that alleged deficiencies in her "hearing and visual acuity" were not supported by evidence in the record.  Ellison does not specifically challenge these finding, and they are supported by substantial evidence in the record.

of age, education, or work experience." **Brady v. Heckler**, 724 F.2d 914, 920 (11th Cir. 1984) *quoted in* **Stratton v. Bowen**, 827 F.2d 1447, 1450 (11th Cir. 1987).  Ellison has the burden of proving her alleged impairments are severe.  *See* 20 C.F.R. §§ 404.1512(a) and (c), 416.912(a) and (c); *see also*, *e.g.*, **Ellison v. Barnhart**, 355 F.3d 1272, 1276 (11th Cir. 2003); **Carnes v. Sullivan**, 936 F.2d 1215, 1218 (11th Cir. 1991).

### 1.      Carpal Tunnel Syndrome

Noting Ellison's previous history of carpal tunnel syndrome, the ALJ nonetheless held that evidence in the record simply did not establish that she suffered from this condition during the relevant period (R. 25).  Ellison relies primarily on treatment received in 1995 and 1996 as well as a consultative examination performed in 1999 to establish otherwise.  It should be noted that these records presumably formed the basis for the SSA's previous denial of benefits, which occurred, finally, in March 2000, and which is binding on this court.  *See* 20 C.F.R. § 404.921 (2005); *see also* **Wolfe v. Chater**, 86 F.3d 1072, 1078 (11th Cir. 1996) (setting forth the exceptions to the application of the principle of *res judicata* in the context of a disability determination).[4]

The SSA previously determined that Ellis' carpal tunnel syndrome, the pain in her legs, and her hypertension did "not significantly affect [her] ability to carry out most routine

---

[4]The ALJ expressly stated that he was not reopening the previous decision (R. 20).  Although such a disclaimer is not dispositive, nothing about the ALJ's opinion suggests that he *de facto* revisited the earlier disability determination.

activities [or] . . . [her] ability to work" (R. 37).  Thus, these conditions were considered non-severe, according to that term's regulatory definition.  20 C.F.R. §§ 404.1521(a), 416.921(a) (2005).  This court may not now determine that, based on the same evidence, the current decision is not supported by substantial evidence.

Ellison also relies on a psychological consultation report noting that she was "wearing a wrist brace on her right wrist" as well as an opinion from a sate agency medical consultant that she had "*possible* carpal tunnel syndrome bilaterally" (R. 245, 251) (emphasis added).[5] While these vague assertions may or may not be suggestive of a *possible* condition, they simply are insufficient to prove that a condition actually exists.


2.     **Heart condition**

As with her alleged carpal tunnel syndrome, evidence that Ellison suffered a heart condition unrelated to her hypertension, which the ALJ deemed severe, is lacking.  Records from a hospital visit in June 2003 indicate that she was hypertensive and experiencing chest pain, which an examining physician, Dr. Thomas E. Young, later described as "unspecified" and opined that it "could be aggravated because of severe hypertension, could be angina, could also be muscular pain" (R. 406).

---

[5]The medical consultant described his examination of her upper extremities as follows: "There is normal range of motion for the shoulders, elbows and wrists.  Grip strength is 5/3 bilaterally.  I do not think I am getting maximum cooperation.  There is finger to thumb approximation bilaterally.  There is no swelling of any joint" (R. 245).  Although he also noted that "Tinel's sign was highly positive on both wrists," he followed this by stating, "I believe that I was not given direct response [sic] by her" (R. 245).

Furthermore, chest x-rays taken more than three years apart revealed only "borderline" and "mild cardiomegaly," respectively (R. 211, 402), and there is evidence of neither the cause of this condition nor the impact it may have on Ellison's ability to work. Finally, a suspicion in 2000 of mild congestive heart failure was never confirmed diagnostically (R. 211).


D.      *Examining Physician's Opinion*

The ALJ also discredited the opinion of Dr. Buren E. Wells ["Wells"], a state agency medical consultant who examined Ellison in March 2003 and concluded that she could not "function" (R. 245).  According to the ALJ, Dr. Wells was not qualified to render that opinion (R. 29).  Furthermore, the ALJ stated that Dr. Wells' ultimate opinion was unsupported by the record and his opinion was not fully explained.  *Id.*

As a two-time consultative examiner whose examinations were separated by more than 3 ½ years, Dr. Wells is not a treating source whose opinion is entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (noting that the opinions of "one-time examiners" are "not entitled to deference").  Nevertheless, the Eleventh Circuit's standard  for discounting a treating source's opinion provides a satisfactory guideline for determining whether the ALJ's decision to dispose of Dr. Wells' opinion was erroneous.

Treating physicians' opinions are accorded "substantial or considerable weight unless good cause is shown . . .." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004)

10

(quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  Good cause exists when, for example, "the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1241.

The court is uneasy about sanctioning the ALJ's ability, in general,  to discredit, on the basis of qualifications, a consultant paid for by the SSA for the purpose of providing a medical opinion.  After all, the SSA chooses the consultant and "will purchase a consultative examination *only from a qualified source*."  20 C.F.R. §§ 404.1519g(a), 416.919g(a) (2005); *see also* §§ 404.1519, 404.1616, 416.919, 416.1016.  Furthermore, "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1527(f)(2)(I), 416.927(f)(2)(I) (2005).

The ALJ did not make clear whether he was questioning Dr. Wells' qualifications to make disability determinations based on medical or psychological impairments.  While he might not be qualified to opine on the latter, questioning his ability to speak to the former is disingenuous.  Nevertheless, although the ALJ should have explained his decision in this regard more thoroughly, his failure to do so did not prejudice Ellison because his other stated reasons for discrediting the opinion are supported by the record.

Among the many factors an ALJ must consider when evaluating the opinion of a nontreating, examining physician are "supportability" and "consistency."  20 C.F.R §§

404.1527(f)(2)(ii), 404.1527(d)(3)-(4), 416.927(d)(3)-(4).[6]  In this case, the medical evidence in the record simply does not support Dr. Wells' opinion that Ellison cannot do "work related activities such as sitting, standing, walking, lifting, carrying or handling objects" (R. 245).  Furthermore, Dr. Wells' "discussion" regarding her physical (as opposed to psychological) condition is extremely limited, noting only that she "seemed to be in pain when examining her lower extremities, particularly her left hip" and "[s]he was able to walk." *Id.*  Thus, the ALJ had reasonable grounds to question the soundness of Dr. Wells' disability determination.

In addition, it appears that Dr. Wells' opinion was based on Ellison's psychological conditions, not her physical limitations.  He wrote, "I have read the enclosed material but I feel like this lady's main problem is psychological, and *from that standpoint* I do not think she can function." *Id.*  While Dr. Wells may or may not be qualified to offer such an opinion, his conclusion is contradicted by the observations of Robert J. Nolan ["Nolan"], a clinical

---

[6]     *Supportability.* The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. . . .

20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

        *Consistency*.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

§§ 404.1527(d)(4), 416.927(d)(4).

psychologist who, upon examining Ellison, expressed deep reservations regarding her veracity and described her condition merely as "Pain Disorder of Unspecified Medical Etiology, Accompanied by Depressive Features" (R. 252).[7] In addition, Dr. Fay Ferrell ["Dr. Ferrell"], a treating physician who supervised her psychotherapy, determined that her depressive condition was "moderate" (R. 240).[8]

Finally, Dr. Wells himself admitted believing that Ellison was being uncooperative and evasive. *Id.* Therefore, the ALJ had good cause to discount Dr. Wells' opinion, and his decision to disregard it entirely was strongly supported by the record.

### E.    *RFC Assessment*

Based on his finding that Ellison "possesses a 'mild' limitation in her ability to perform daily activities, a 'moderate' restriction in her capacity to maintain social functioning and maintain concentration, and would experience no episodes of extended decompensation in her attempts at performing work and work-like activities," the ALJ determined that Ellison could perform "medium unskilled work activity not involving frequent public interaction" (R. 30). Relying almost exclusively on Dr. Wells' examination,

---

[7]"We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).

[8]Furthermore, Dr. Ferrell noted that her attendance of group therapy meetings and medication compliance was "sporadic" (R. 239), which parallels Ellison's approach to her hypertension, as discussed *infra*. In fact, Dr. Ferrell also refused to sign a "food stamp form" for Ellison, noting that she has ignored repeated warnings regarding her high blood pressure and she "won't take steps to help self" (R. 307).

Ellison contends that the ALJ's decision is not supported by the record. For reasons already explored, it is not necessary to address Dr. Wells' opinion on this point. Therefore, the court focuses on Ellison's other medical evidence.

Ellison's medical records reveal a long history of hypertension that is well-controlled by medication when taken and an equally long history of Ellison's refusal to take either her medicine or the advice of her physicians (R. 166-74; 203-04; 211; 213-15; 229-33; 235; 381; 402-49).[9] Furthermore, Dr. Wells' previous, one-time, diagnosis of osteoarthritis was not

---

[9]This alone might have supported a finding that Ellison is not disabled, 20 C.F.R. §§ 404.1530(b), 416.930(b); ***Dawkins v. Bowen***, 848 F.2d 1211, 1213-14 (11th Cir. 1988).

Although financial ability was noted in a couple of instances as a possible contributing factor to her noncompliance (R. 213, 404), it appears more likely that she was simply generally unwilling or unconcerned. In 1997, when Ellison earned more than $15,000, Dr. David Williams noted that Ellison stated that "she[] just elected recently not to take her medicines and doesn't recall what she used to be on" (R. 167). In March 1999, Dr. Gregory Johns noted that Ellison had "discontinued" her medication "on her own volition" (R. 182). In April 2000, Dr. Clifford Quintana ["Dr. Quintana"] noted that she

> [w]as once on anti-hypertensive medications. Patient has not taken
> any in years. I recommended to the patient that she start taking her
> medication, however, the patient refuses. Does not wish to be on
> any medicines at this time. Patient informed of the extreme risk
> that she was putting herself at, including kidney disease, heart
> disease and neurological events but not just exclusively of those.
> Informed the patient that it could significantly shorten her life span
> not to be on anti-hypertensive medications, however, the patient
> still refuses at this time.

(R. 214).

Two months later, although she expressed a willingness to take medication and accepted free samples that proved to treat her condition, she nevertheless refused to be admitted to the hospital for additional testing (R. 211). Dr. Joseph H. Suggs in February 2001 noted that she had gone without her medication for a month (R. 233) and in September 2001 noted that she had not taken her medication the day he saw her (R. 229).

14

confirmed, and Ellison sought help for pain in her knees only once during the relevant time period (R. 220). At that time, Dr. Keith Granger ["Dr. Granger"] could not conclusively determine the cause of her complaints (R. 205). Although he noted "tenderness over the left greater trochanteric bursa and the left SI joint" as well as "some crepitance with motion of the left knee and mild effusion", he also stated that she was not in "acute distress." *Id.* Moreover, he opined, "Neurologically I don't find any focal deficits in either lower extremity." *Id.*

Finally, nothing in the record suggests that her sleep apnea, which was fairly recently diagnosed and is treatable (R. 393; 450-55), or weight, which was noted only as a personal statistic and not a health issue, more than minimally affected Ellison's ability to work. Therefore, while the record actually may have supported a decision that Ellison had no severe physical impairments whatsoever, it certainly supports his finding that her impairments were not so severe as to affect her ability to perform the physical demands of her previous employment.

**F.    *Subjective Complaints***

Ellison contends that the ALJ erred in evaluating her subjective complaints because he "presume[d] that since Ms. Ellison participates in some daily activities than [sic] she must not be suffering from pain or the mental effects of depression or anxiety" (Doc. # 13-1, p. 15). This argument misconstrues the ALJ's opinion, which considered Ellison's daily activities as but one factor in finding her complaints were not credible (R. 27). *See* 20 C.F.R.

§§ 404.1529, 416.929 (including daily activities among the factors the SSA will consider in evaluating subjective complaints).  He also considered evidence seriously undermining her veracity, and he concluded that the medical evidence in the record did not "corroborate the claimant's alleged symptoms."  Therefore, Ellison's position is untenable.

### G.    Development of the Record

During the course of her administrative hearing, the ALJ prevented Ellison's counsel for exploring further her testimony regarding her alleged crying spells (R. 491-92).  Ellison contends that this was an error.  While the court does not condone the ALJ's interference with the questioning on what appears to be a relevant subject, even assuming the ALJ's actions constituted legal error, his mistake did not prejudice Ellison.

Ellison's attorney made no attempt to object or explain to the ALJ how the information to be elicited would be helpful.  In addition, throughout three years of sporadic treatment for her alleged depression, she complained of being tearful only three times (R. 312, 340, 353).

Dr. Wells noted that she was crying during the 2003 examination (R. 243), but three days later, at her psychological examination with Nolan, she informed him that she had been "very upset when evaluated by Dr. Buren Wells . . ..  She did not like to be disrobed.  She said that he pulled on her leg and turned it in, and it caused her to hurt, and that it caused bruises and is very painful" (R. 251).  She also told Nolan that she was frequently tearful but

did not state that she actually cried (R. 251).  *Cf.* ***Filipi v. Chater***, 56 F.3d 68, 1995 WL 276401 (8th Cir. 1995) (table) (dismissing claimant's argument that the ALJ "cut off testimony" regarding her disability when the information she attempted to provide was not supported by the record); ***Donegan v. Apfel***, No. 00-50-P-C, 2000 WL 1511200, at *3 n.6 (D. Me. 2000) (finding no reversible error when the circumstances suggested a lack of concern by the attorney, who did not object, and a lack of evidence supporting the desired testimony).

Finally, the record in this case contains nearly 100 pages of notes from Ellison's psychotherapists, and, in light of the significant evidence undermining her credibility, further testimony most likely would not have aided her cause.


**H.      *Mental Demands of Previous Employment***

The ALJ concluded that Ellison's mental impairments restrict her from working in situations involving frequent "public" interaction (R. 30).  Ellison does not object to this finding but argues instead that the ALJ failed to consider the "mental demands of [Ellison's] past relevant work," namely the requirement that she be able to concentrate (Doc. # 13-1).

Ellison's argument appears to overlook the fact that the ALJ expressly found that she had a moderate limitation in her ability to concentrate.  In addition, Ellison offered no evidence regarding the level of concentration necessary to perform her previous employment.

The ALJ thoroughly discussed all of the evidence in the record as well as the relevant job requirements explained in the Dictionary of Occupational Titles for listing 920.587-018,

"packager, hand" and Ellison's own description of her former job duties.  In short, the ALJ considered all of the relevant requirements and thus committed no error.

Ellison has failed to provide evidence that her alleged impairments preclude her from returning to work.  The ALJ committed no legal errors that prejudiced her, and each of his findings is fully supported by the record.


### IV.   CONCLUSION

Therefore, it is hereby

ORDERED that the final decision of the Commissioner be and is AFFIRMED.

DONE this 7th day of September, 2005.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE